**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| STEVEN MENZIES, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: |
| v. | ) | |
| | ) | |
| SEYFARTH, SHAW LLP, an Illinois limited | ) | |
| liability partnership; GRAHAM TAYLOR, individually; | ) | |
| NORTHERN TRUST CORPORATION, | ) | |
| a Delaware corporation; and CHRISTIANA BANK & | ) | |
| TRUST COMPANY, a Delaware corporation, | ) | |
| | ) | |
| Defendants, | ) | |

**COMPLAINT**

Plaintiff, Steven Menzies, by and through its undersigned counsel, for his Complaint against Defendants Seyfarth, Shaw LLP, Graham Taylor, Northern Trust Corporation, and Christiana Bank & Trust Company (collectively, "Defendants"), states as follows:

**NATURE OF ACTION**

1.     Plaintiff, Steven Menzies ("Menzies"), is the co-founder, President and Chief Operating Officer of Applied Underwriters Inc. ("AUI"), a financial services firm that specializes in providing workers' compensation insurance for small and mid-sized businesses. Defendants, comprising of lawyers, bankers, and financial planners, conspired to develop, market and promote to, among others Menzies, an abusive tax avoidance scheme – disguised as a tax savings plan that would lawfully shield capital gains from the sale of his AUI stock from tax liability.  Menzies was an unwitting participant of Defendants' scheme.  Ultimately, and after Menzies relied, to his detriment, on the Defendants' fraudulent representations, the Internal Revenue Service determined that Menzies' disposition of over $60 million of AUI stock into

various tax shelters was done with "the primary purpose … to disguise the ownership of the stock, inflate [Plaintiff's] basis, and allow [Plaintiff] to evade … tax liabilities related to the stock sale."  As a result of Defendants' fraudulent misrepresentations, omissions, and conduct in creating, promoting, and implementing the abusive tax avoidance scheme, Menzies has suffered many millions of dollars of damages.

## PARTIES

2.      Plaintiff Steven Menzies ("Menzies") is an individual and citizen of the State of Nebraska.

3.      Defendant Seyfarth, Shaw LLP ("Seyfarth") is a limited liability partnership organized and existing under the laws of the State of Illinois with its principal place of business in Chicago, Illinois.

4.      Seyfarth is a global law firm with over 800 attorneys with offices in the U.S., London, Shanghai, Melbourne and Sydney.  Seyfarth, with its national and international presence, claims a special expertise in tax planning services to help "clients structure their business and investment activities," including in "assist[ing] both domestic and foreign clients in … tax deferral strategies."

5.      Upon information and belief, Defendant Graham Taylor ("Taylor") was a partner of Seyfarth at times relevant to the allegations of this Complaint.  Taylor is an individual and citizen of the State of California.

6.      Taylor, at relevant times to this Complaint, was a tax attorney licensed to practice in both New York and California.

7.      On January 24, 2008, Taylor pled guilty in Utah to fraud in a $20 million tax fraud conspiracy case in which Taylor relinquished his law licenses in California and New York.

2

The suit prosecuted by the United States Government arose out of opinion letters that Taylor drafted to investors in furtherance of tax shelter schemes.

8.      Defendant Northern Trust Corporation ("Northern Trust") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Chicago, Illinois.

9.      Northern Trust is one of the oldest and most well-recognized financial services firms, with offices around the United States and the world.  Northern Trust describes itself as a financial services firm "uniquely qualified to manage clients' trust assets" through their comprehensive financial planning, which includes their "income tax planning" services. Northern Trust markets itself on its professional relationships with the necessary financial institutions and law firms across the United States and world that make the firm a leader in "personal fiduciary, investment, private banking, wealth management, and worldwide trust and custody services."

10.     Upon information and belief, Defendant Christiana Bank & Trust Company ("Christiana Bank") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Wilmington, Delaware.

11.     Christiana Bank, a division of WSFS Financial Corporation, is a professional trust, tax, and investment services financial institution.  Christiana Bank markets itself as a unique supplier of personal and professional "trust, tax, and investment services" for "individuals and families with substantial assets [who] want workable, effective ways to help [] minimize the impact of income and estate taxes…."

## JURISDICTION

12.     This Court has subject matter jurisdiction in this case pursuant to 18 U.S.C. § 1964(c) and 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.  Alternatively, this Court has subject matter jurisdiction in this case pursuant 28 U.S.C. § 1332, and the matter in controversy exceeds the sum of seventy five thousand dollars, exclusive of interest and costs.

## VENUE

13.     Venue is proper in this District pursuant to: 18 U.S.C. § 1965(a) because one or more of the Defendants resides, may be found, has an agent, or transacts business in this District; and/or, 18 U.S.C. § 1965(b) because the ends of justice require that the parties residing in any other district be brought before this Court; and/or, 28 U.S.C. § 1391(a) and 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.

14.     In particular, venue is proper as: (i) Seyfarth's principal place of business is in this District, (ii) Taylor as co-conspirator of Seyfarth was present and doing business in the State of Illinois, (iii) Northern Trust's principal place of business is in this District, and (v) Christiana Bank's conduct in this District as alleged in the Complaint has been committed by and through its co-conspirators, including Northern Trust and Seyfarth.

15.     In connection with the wrongs complained of herein, Defendants directly or indirectly used the means and instruments of interstate and foreign commerce, including the United States mail and interstate and foreign wire communications.

## FACTUAL BACKGROUND

16.     Defendants devised and implemented an abusive tax avoidance scheme which was disguised as a legitimate estate planning tax savings strategy which purported to lawfully reduce (if not eliminate) capital gains tax on a participant's, such as Menzies disposition of stock.  Defendants developed a scheme by which they purported to artificially inflate the shareholder's basis in stock and thereby diminish or eliminate capital gain associated with the sale.  (The scheme will be hereafter referenced as the "Abusive Tax Avoidance Scheme.")

17.     The generation of substantial fees to be paid by the participants, such as Menzies, to the Defendants was the primary motivation for each Defendant to knowingly conspire, participate in, promote, market and implement the Abusive Tax Avoidance Scheme   (the "Defendants' Conspiracy").

18.     Each Defendant was integral to the success of Defendants' Conspiracy.

19.     Seyfarth and Taylor served as legal counsel to participants in the scheme by providing opinion letters supporting the legitimacy of the tax benefits of the Abusive Tax Avoidance Scheme, despite the fact that the opinions were based on assumptions that Seyfarth knew were untrue.

20.     Seyfarth stood to earn fees from the fraudulent legal advice it provided to the participants of the Abusive Tax Avoidance Scheme.

21.     Northern Trust through its agents Mark Harbour ("Harbour"), Michael Niemann ("Niemann") and Tom Hines ("Hines") (collectively the individual conspirators on behalf of Northern Trust will be referred to as the "Individual Northern Trust Conspirators") promoted and marketed the Abusive Tax Avoidance Scheme to high-net worth individuals, and coordinated the efforts among the Defendants in furtherance of the Abusive Tax Avoidance Scheme.

22.     In exchange for its participation in the Abusive Tax Avoidance Scheme, Northern Trust was to generate fees from the participants.

23.     Christiana Bank through its agent Joseph Freney ("Freney") agreed to act as trustee of the trusts to be created for the appearance of proper fiduciary dealings in approving the transactions in furtherance of the Abusive Tax Avoidance Scheme.

24.     In exchange for its participation in the Abusive Tax Avoidance Scheme, Christiana Bank was to receive fees for each trust it supervised.

25.     In furtherance of the Abusive Tax Avoidance Scheme, Defendants were assisted by the efforts of European American Investment Bank, AG ("Euram Bank"), an Austria private bank.  Euram Bank was created in 1999 and provides specialized "Private Banking, Asset Management, Corporate Finance and Card Payment Services" to its "wealthy international and domestic clients."  In particular, with Euram Bank's "well established network of partner firms," Euram Bank promotes itself as a bank that provides "creative financial solutions" for "private owners" to structure transactions to "sell their company or strategic shareholding."

26.     The United States Senate specifically identified Euram Bank as one of the regular participants in abusive tax shelters schemes during the hearings of the Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs of the United States Senate, One Hundred and Ninth Congress.

27.     Upon information and belief, Euram Bank through its agents Paul Freilich ("Freilich"), John Staddon ("Staddon"), Rajan Puri ("Puri"), Tom Seck ("Seck"), and Shaikah Arfan ("Arfan") (collectively the individual conspirators on behalf of Euram Bank will be referred to as the "Individual Euram Bank Conspirators"), were responsible for engaging in the

purported financial transactions designed to produce the fraudulent tax benefits contemplated by the Abusive Tax Avoidance Scheme and provide the scheme with its patina of legitimacy.

28.     In or about November 2002, Northern Trust contacted Menzies and other senior executives at AUI to determine if they were interested in Northern Trust's estate planning service.  Menzies and others at AUI agreed to a meeting for purposes of learning about the estate planning services being offered by Northern Trust.

29.     In or about late November 2002, various Northern Trust personnel, including Harbour and Niemann, visited Menzies and other senior executives at AUI's offices in Nebraska. At this meeting, Northern Trust put on a presentation to highlight its breadth of knowledge in estate planning and personal financial services.

30.     Throughout the next few months, Northern Trust was still marketing and communicating with Menzies (and other AUI executives) about estate planning and personal financial services solutions.  In particular, through in person meetings and various phone calls Northern Trust was discussing with Menzies ways in which he might be able to avoid certain types of tax liabilities, including those related to Menzies' ownership of significant stock in AUI.

31.     In January of 2003, Northern Trust sent a proposal to Menzies for personal financial consulting.  The proposal provided that Northern Trust would (1) review Menzies financial data and personal information, (2) develop a financial plan of action tailored to Menzies' "goals and objectives," and (3) implement such plan of action.

32.     A key element of Northern Trust's proposal to Menzies was to provide financial planning for income tax liability "and special strategy ideas relative to any potential liquidity events."  In this regard, the Northern Trust proposal included such services as: "[e]vauluat[ing] tax strategies related to investments, retirement planning, estate planning, education funding and

other areas in order to minimize federal and state income tax liability;" "[p]repar[ing] or review[ing] periodic income tax projections with regard to regular and alternative minimum tax;" "[i]dentify[ing] alternative estate planning techniques … to minimize estate taxes and/or enhance flexibility…;" and "[r]eview[ing] Applied Underwriters compensation and benefit plans [to provide] suggestions for plans that you may with [sic] to incorporate to enhance wealth creation opportunity or executive retention goals."

33.     In March of 2003, Menzies agreed to engage Northern Trust under this proposal for the financial planning services, and specifically for the tax planning services.

34.     Upon information and belief, by mid-2003, the Individual Northern Trust Conspirators had gathered sufficient information with which to target Menzies and other AUI executives for the Abusive Tax Avoidance Scheme.

35.      On or about May 20, 2003, Harbour sent an email to Menzies in furtherance of Northern Trust's engagement with Menzies to discuss the range of "tax planning" solutions Northern Trust could offer related to his ownership of AUI stock, and the potential disposition of that stock.

36.     By early July 2003, the Individual Northern Trust Conspirators pitched to Menzies and others at AUI specifics related to the Abusive Tax Avoidance Scheme, and marketed it as a lawful tax strategy for the disposition of the AUI stock, which could be supported by Menzies' estate planning objectives.

37.     On or about July 30, 2003, the Individual Northern Trust Conspirators arranged a conference call with Menzies to discuss the basic steps of the complex transactions comprising the Abusive Tax Avoidance Scheme, describing the plan to Menzies as a legal tax shelter for the contemplated gains realized from the disposition of AUI stock.

38.     In particular, on this call Northern Trust explained to Menzies that through a series of loans, unsecured structured notes from Euram Bank, and the creation of trusts and various other complicated transactions, Menzies would be able to shield most or all of his gain on the disposition of the AUI stock from tax liability.

39.     During this same call, Menzies was assured by the Individual Northern Trust Conspirators that the tax shelters were legal and proper.   The Individual Northern Trust Conspirators did not disclose to Menzies on this call—or ever—that this type of tax shelter was unlawful and would subject Mr. Menzies to liability for tax, penalties and interest.

40.     Based on Northern Trust's explanation of the Abusive Tax Avoidance Scheme and representations that the scheme was lawful and would provide the tax saving benefits, and in reliance upon the reputation, integrity and expertise of this financial institution, Menzies agreed to proceed in setting up the transactions for the purpose of allowing him to sell his AUI stock and legally avoid tax liability.

41.     Menzies is not a lawyer, estate planner, or tax expert, and has no training or experience in any of these disciplines.   He did not have knowledge of the complex tax, legal and estate planning laws, rules, and regulations relevant to the Abusive Tax Avoidance Scheme. Rather, Menzies reasonably relied on Northern Trust for their purported expertise.   Because Menzies reasonably relied upon Northern Trust in guiding him through these transactions, Menzies did not retain outside professionals to advise him on the transactions.

42.     Upon information and belief, on or about July 31, 2003, a conference call took place by and between Individual Euram Bank Conspirators and the Individual Northern Trust Conspirators.   Menzies was not on this call.   Upon information and belief, Freney and Taylor also participated on this conference call.   Upon information and belief, the purpose of the call

9

was to advise that Menzies (as well as other AUI executives) had agreed to proceed with the Abusive Tax Avoidance Scheme.  Upon information and belief, the parties further discussed details on how the transactions would be structured and implemented and ways in which the parties would introduce one another to Menzies and the other AUI targets in furtherance of Defendants' Conspiracy.

43.     Upon information and belief, on or about August 7, 2003, another conference call took place between the Individual Euram Bank Conspirators, the Individual Northern Trust Conspirators and Taylor of Seyfarth.  Menzies again was not on this call.  Upon information and belief, Freney also participated on the conference call.  Upon information and belief, the purpose of this call was to discuss details of drafting the Euram Bank loan documents, the promissory notes, and the necessary trust documents in furtherance of the Abusive Tax Avoidance Scheme.  Upon information and belief, Taylor promised during the call to draft the necessary opinion letters to provide the purported legal justification and legitimacy for this tax shelter.

44.     On or about August 7, 2003, and in furtherance of Defendants' Conspiracy and the Abusive Tax Avoidance Scheme, Niemann from Northern Trust emailed Menzies and advised him to retain Taylor.  In fact, Niemann wrote to Menzies: "You need to contact and retain Graham Taylor as attorney for this transaction.  Graham is up to speed and can quickly get documents ready to sign."   Menzies followed Niemann's advice and retained Taylor as his lawyer.

45.     Neither at this time, nor ever, did Northern Trust or Seyfarth advise Menzies of the relationship between each other or their relationship with the other Defendants.  No one advised Menzies that the legal services Seyfarth was going to perform, including the drafting of

the opinion letters, were part of a conspiracy and not in fact an independent legal evaluation of the tax strategies.

46.     In furtherance of Defendants' Conspiracy and the Abusive Tax Avoidance Scheme, the Individual Northern Trust Conspirators further advised Menzies to engage Christiana Bank as trustee for the various trusts.  Menzies retained Christiana Bank as trustee for the various trusts.

47.     Again, neither at this time, nor ever, did Northern Trust or Christiana Bank advise Menzies of the relationship between each other or their relationship with the other Defendants.

48.     Defendants then guided Menzies through a series of integrated, pre-arranged, and scripted steps, all in furtherance of the Abusive Tax Avoidance Scheme, promising Menzies a lawful tax savings tool that would eliminate capital gains on the disposition of his AUI stock.

49.     The first step in the Abusive Tax Shelter Avoidance Scheme was for Menzies to obtain a loan from Euram Bank in an amount equivalent to the value of the AUI stock he intended to sell.  On or about August 11, 2003, Menzies obtained a paper loan from Euram Bank for approximately $19 million, which was the anticipated value of the AUI stock he wished to protect from taxable gain on the sale.  Per the loan agreement, the funds were to be deposited into an account at Euram Bank, for which Menzies agreed to pay Euram Bank significant fees and interest (LIBOR plus 40 basis points).

50.     Because Euram Bank knew that pursuant to the Abusive Tax Avoidance Scheme, the loan proceeds would never leave the effective control of Euram Bank, Euram Bank did not require Menzies to provide much, if any, financial information to support the paper loan.  At that time he entered into the loans, Menzies had no idea that he would not have possession of, or control over, the loan proceeds.

51.     On or about August 25, 2003, the "Steven Menzies Grantor Retained Remainder Trust" ("Menzies GRRT") was created for Menzies.

52.     The Menzies GRRT provided that Menzies retained the power in a non-fiduciary capacity to re-acquire the trust corpus by substituting other property of equal value.   The Menzies GRRT further provided that Menzies retained a remainder interest in the trust, namely, the assets of the trust remaining upon termination of the trust term.

53.     The Menzies GRRT named the "Menzies Discretionary Trust" as the "unitrust" beneficiary of the trust.  Per the terms of the Menzies GRRT, the Menzies Discretionary Trust was entitled to receive annual distributions in an amount equal to 1% of the assets of the Menzies GRRT (the "Unitrust Distributions") for the term of the trust.  The Menzies Discretionary Trust was in turn obligated to pay the Unitrust Distributions it received from the Menzies GRRT to Menzies' mother, Ann Menzies, as beneficiary of the Menzies Discretionary Trust.   The remainder interest in the Menzies Discretionary Trust was held by Menzies personally.

54.     The trustee of the Menzies GRRT and the Menzies Discretionary Trust was Christiana Bank.

55.     Once the Menzies GRRT was created, the Menzies GRRT opened a bank account at Euram Bank.  Menzies was then directed to deposit the $19 million loan from Euram Bank into the Menzies GRRT account at Euram Bank.  This purportedly represented Menzies' initial funding of the Menzies GRRT.  The proceeds of the loan from Euram Bank therefore never left Euram Bank.

56.     On or about August 26, 2003, Christiana Bank, as trustee of the Menzies GRRT, then invested the loan funds deposited in the Menzies GRRT with Euram Bank, the very party who had loaned the funds to Menzies and who at all times remained in possession of the funds.

The "investment" was a promissory note issued by Euram Bank paying interest of 3 months of LIBOR plus an equity multiplier based on the performance of gold (referred to hereafter as the "Euram Bank Structured Note").  At this stage of the transaction, Euram Bank had now received back its original $19 million loan, but had an obligation to make payments to the Menzies GRRT under the terms of the Euram Bank Structured Note.

57.     A second trust was created for Menzies named the Persephone Trust ("Persephone Trust").  This trust was created on or about September 24, 2003, and was for the benefit of the Menzies Discretionary Trust.  The trustee of Persephone Trust was once again Christiana Bank.

58.     On or about September 26, 2003, Menzies sold his remainder interest in the Menzies GRRT (which held the unsecured structured note from Euram Bank) to the Persephone Trust valued at approximately $18.9 million, in exchange for a promissory note of equal value from the Persephone Trust to Menzies (referred to hereafter as the "Persephone Trust Promissory Note").  At this stage of the transaction, the Persephone Trust owned the remainder interest in the Menzies GRRT, which held the Euram Bank Structured Note, but the Persephone Trust had a note obligation to Menzies in the principal amount of approximately $18.9 million, *i.e.*, equal to the value of the remainder interest in the Menzies GRRT.

59.     While Menzies no longer personally held the remainder interest in the Menzies GRRT, as the grantor of the trust one of the powers he still held—and which was key to this transaction—was the power to reacquire assets of the Menzies GRRT by substituting other assets of equivalent value.  Under the terms of the trust, Menzies had the right to exercise this power in his absolute discretion and in a non-fiduciary capacity.  On or about early October 2003, through

various phone calls, Menzies was assured by Taylor and Harbour that this substitution of assets would be a non-taxable event.

60.     On or about October 10, 2003, Menzies was instructed, and then proceeded, to substitute in exchange for the assets of the Menzies GRRT, namely, the Euram Bank Structured Note, a fixed number of AUI shares of equivalent value.

61.     After the substitution of assets, the Menzies GRRT held the AUI stock and Menzies held the Euram Structured Promissory Note.  Menzies thus had a receivable from Euram Bank (the Euram Bank Structured Note) which was virtually identical in value to his payable to Euram Bank (the loan obligation to Euram Bank arising from Menzies originally borrowing described above).

62.     In order to satisfy Menzies' original Euram Bank loan obligation, and at a time later, Menzies used the Euram Bank Structured Note as repayment for his personal debt obligation to Euram Bank.  Both the Euram Bank loan and the Euram Bank Structured Note were therefore extinguished.

63.     At this point in the transaction, the Persephone Trust owned the remainder interest in the Menzies GRRT, and the "unitrust" beneficial interest in the Unitrust Distributions was held by the Menzies Discretionary Trust.  The Menzies Discretionary Trust then sold this unitrust interest to the Persephone Trust.  The Persephone Trust now owned both the unitrust interest and the remainder interest in the Menzies GRRT.  The sole asset of the Menzies GRRT was the AUI stock which had earlier been substituted by Menizes.  On or about February 25, 2004, the Menzies GRRT was terminated and the Persephone Trust, as the holder of all the legal and beneficial interest of the trust, received the AUI stock on termination of the trust.

64.     As of February 25, 2004, the financial transactions were complete.   The Persephone Trust now held the AUI stock valued at approximately $19 million and, per the Persephone Trust Promissory Note, owed an obligation to Menzies personally for approximately $19 million.   (The above transactions described above will be referred to hereafter as the "2003 Tax Shelter.")

65.     But for the scheme pitched to him by the Defendants, Menzies had no interest in obtaining a loan from Euram Bank, establishing various trusts, or investing with Euram pursuant to structured notes.   Menzies engaged in the various transactions that made up the 2003 Tax Shelter, as directed by Defendants, solely for the purpose of being able to lawfully sell his AUI stock while reducing his tax liability.   Menzies was assured by the Individual Northern Trust Conspirators and by Taylor that the 2003 Tax Shelter would eliminate gains from the sale of his AUI stock so long as (i) the proceeds of the sale were paid to the Persephone Trust  as owner of the stock (and with full tax basis in the stock) and (ii) Menzies would receive said proceeds from the Persephone Trust Promissory Note in repayment of Persephone Trust Promissory Note held by Menzies.

66.     In particular, in or about February 2004, Defendants had multiple phone calls with Menzies in which they represented to Menzies that:

      a.     The 2003 Tax Shelter was valid, legitimate, and legal under federal and state law;

      b.     The 2003 Tax Shelter was a lawful tax avoidance mechanism and that it was not a fraudulent tax shelter;

      c.     The 2003 Tax Shelter would not be subject to challenge by the IRS;

      d.      The 2003 Tax Shelter was in compliance with all applicable court procedural and legal rules for federal tax purposes;

      e.      The 2003 Tax Shelter would not subject him to tax penalties;

      f.      The 2003 Tax Shelter would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

      g.      The various trusts being formed to execute the 2003 Tax Shelter had a business purpose and economic substance; and

      h.      The various loans and promissory notes being created in furtherance of the 2003 Tax Shelter had a business purpose and economic substance.

67.     In June of 2004, the Defendants performed a substantially identical transaction involving the same parties, but for the potential sale of $54 million of AUI stock (the "2004 Tax Shelter").

68.     Like with the 2003 Tax Shelter, the 2004 Tax Shelter utilized essentially the same steps: Menzies obtained a $54 million loan from Euram Bank, Menzies formed a grantor retained remainder trust, the trustee of the grantor retained remainder trust then invested the proceeds of the loan with Euram Bank and received a structured note from Euram Bank, Menzies then sold his remainder interest in the grantor retained remainder trust to the Persephone Trust in consideration for a promissory note, Menzies then substituted for the assets within the grantor retained remainder trust of AUI stock, Menzies then held a receivable from Euram Bank (the structured note) offset by his payable to Euram Bank arising from his original loan, and the grantor retained remainder trust was terminated with Persephone Trust receiving the AUI stock on termination of the trust.  The Persephone Trust owed a promissory note obligation to Menzies for the value of the AUI stock, and Persephone Trust held the AUI stock.

69.     Again, but for the scheme pitched to him by the Defendants, Menzies had no interest in obtaining a loan from Euram Bank, establishing various trusts, or investing with Euram pursuant to structured notes.  Menzies engaged in the various transactions that made up the 2004 Tax Shelter, as directed by Defendants, solely for the purpose of being able to lawfully sell his AUI stock with little or no tax liability.  Menzies was assured by the Individual Northern Trust Defendants and by Taylor that the 2004 Tax Shelter would eliminate capital gains from the sale of his AUI stock given that (i) the proceeds of the sale were paid to the Persephone Trust as owner of the stock (and with full tax basis in the stock) and (ii) Menzies would receive said proceeds from the Persephone Trust  in repayment of the Promissory Note held by Menzies.

70.     In particular, in our about December 2004, Defendants had multiple phone conferences with Menzies in which they represented to Menzies that:

a.     The 2004 Tax Shelter was valid, legitimate, and legal under federal and state law;

b.     The 2004 Tax Shelter was a lawful tax avoidance mechanism and that it was not a fraudulent tax shelter;

c.     The 2004 Tax Shelter would not be subject to challenge by the IRS;

d.     The 2004 Tax Shelter was in compliance with all applicable court procedural and legal rules for federal tax purposes;

e.     The 2004 Tax Shelter would not subject him to tax penalties;

f.     The 2004 Tax Shelter would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

g.     The various trusts being formed to execute the 2004 Tax Shelter had a business purpose and economic substance; and

h.      The various loans and promissory notes being created in furtherance of the

2004 Tax Shelter had a business purpose and economic substance.

*The Opinion Letters*

71.      As represented to Menzies, the purpose of the complicated (and costly) 2003 Tax

Shelter and 2004 Tax Shelter (collectively referred to as the "Tax Shelters") was to effectively

and lawfully shield the disposition of the AUI stock from capital gains tax.

72.      To provide Menzies with additional assurance that the scheme was legitimate and

lawful, and as Menzies always expected, Taylor informed Menzies that Seyfarth would provide

"independent" opinion letters confirming the propriety of the strategy.   Taylor explained to

Menzies that these "independent" opinion letters would convince the IRS as to the legitimacy of

the Tax Shelters, in the unlikely event that Menzies was audited by the IRS.

73.      On or about September 24, 2004, Seyfarth provided a signed opinion letter for the

2003 Tax Shelter, and, on or about June 7, 2005, Seyfarth provided a signed opinion letter for the

2004 Tax Shelter (these letters will be collectively referred to as the "Opinion Letters").   The

Opinion Letters were nearly identical in form and substance, and both identified that the Tax

Shelters provided a legal means for the tax-free disposition of the AUI stock.   In particular, the

Opinion Letters provided by Seyfarth represented the following to Menzies:

a.      "The *investment strategy* you have pursued … should be in
compliance with all applicable court procedural and legal
rules and should have economic substance, as to both you
and the GRRT, including recognition of the Euram loans as
a loan for federal tax purposes." (emphasis added.)

b.      "[Y]ou should be found to have acted with reasonable
cause and in good faith with respect to the treatment on
your United States federal income return and gift tax
returns with respect to all components of the Transactions
and there is, in our opinion, a greater than 50 percent

18

likelihood that the tax treatment described herein will be upheld if challenged by the IRS."

c.  The "IRS should not succeed in arguing that the [transactions are a sham in substance such] that the sham transaction doctrine [would] appl[y] to the Transactions."

d.  "[W]e conclude that the IRS should not prevail if it invoked the substance over form doctrine to challenge the validity of the Transactions."

e.  "[I]f the IRS argues the Transactions should fail because of the end result test, the IRS should be unsuccessful, because the Transactions are not pre-arranged parts of a single transaction intended from the outset."

74.  At the time of the issuance of the Opinion Letters, Seyfarth (and the other Defendants) knew that these above conclusions (among others) were not true as the factual basis which formed these conclusions were in fact <u>false</u>.  The false assumption expressed by Seyfarth in the Opinion Letters included the following:

a.  "There is no pre-arranged binding agreement between the Trustee of the GRRT and you . . . relating to any element of the Transactions"

b.  "You established the GRRT for estate planning reasons, so as to transfer property of the value to the unitrust beneficiary whilst retaining the remainder interest"

c.  "You later decided that the corpus of the GRRT was likely to appreciate further and desired to transfer this appreciation to the unitrust beneficiary, in order to further reduce the size of your estate."

d.  "[Y]ou concluded that another asset that you owned had an even greater potential of appreciation in the future, so you utilized your power under the GRRT to reaquire trust assets by substituting assets of equal value."

e.  "[A]s part of your overall estate plan, you had motives for establishing the GRRT and later selling your reminder interest in the GRRT to an entity created by the unitrust beneficiaries. . . . At a subsequent point, you decided that

the corpus of the trust was likely to appreciate further and desired to transfer this appreciation to the unitrust beneficiaries in order to further reduce the size of your estate.  Thus, you sold the remainder interest to an entity for the benefit of the unitrust beneficiaries at its then fair market value, so that the unitrust beneficiaries would benefit from any growth in the trust assets occurring after the sale of the sale. . . .  Thereafter you concluded that another asset you owned had an even greater potential of appreciation in the future, and you utilized your power under the GRRT to reaquire trust assets by substituting assets of equal value. . . .  Accordingly, because of your *bona fide* estate planning motives for entering into the Transactions . . . the Transactions should not constitute one or more "'shams in substance.'" (emphasis added.)

f.      "[T]he decision for you to sell your remainder interest in the GRRT and your decision to reaquire the original GRRT assets by substituting assets of equivalent value were not contingent upon the happening of other events.  Rather, each decision was an actual, substantive transaction at the time and each transaction separately altered your economic situation."

g.      "You, the unitrust beneficiaries and Persephone created by the unitrust beneficiaries are not bound in any way to participate in the Transactions as a whole or any particular component of the Transactions.  We are relying on your representation that the entity created by the unitrust beneficiaries and the unitrust beneficiaries themselves had no pre-existing contractual obligation in any element of the Transactions."

h.      "[Y]ou have not been and were not under any obligation agreement or understanding to enter into any element of the Transactions, that each party to the Transactions received independent advice and there has not been and will not be any pre-arranged binding agreements, arrangements or understanding between you and the other parties to the Transactions with respect to the Transactions or any element thereof.  In addition, as previously mentioned, you have a bona fide economic reason for engaging in each of the Transactions and acted independently based on your own economic profit and estate planning motives."

75.     Seyfarth (and the other Defendants) knew that these false assumptions (among others) were the justification which provided the Opinion Letters with a "factual" basis to represent to Menzies that the Tax Shelters would be lawful and provide the tax savings benefits as promised.

76.     With the issuing of the Opinion Letters by Seyfarth, the Defendants completed all necessary transactions in furtherance of the Tax Shelters, and pursuant to the Defendants' Conspiracy were paid substantial fees and expenses from Menzies.

77.     At the time of the Opinion Letters, Menzies was still under the (now known to be mistaken) belief that the Opinion Letters set forth an "independent" opinion of a law firm as to the legitimacy of the Tax Shelters.

78.     Menzies relied on the Opinions Letters.

79.     By late 2005, Berkshire Hathaway Inc. ("BHI") was proceeding in earnest with a proposed acquisition of AUI.

80.     By early 2006, AUI agreed to sell its shares to  BHI.

81.     The transaction was structured such that BHI would purchase the stock of AUI from its stockholders in exchange for a cash payment.  As part of the deal, BHI committed to keeping senior executives at their positions at AUI, which included keeping Menzies in his senior position.

82.     In or about May of 2006, and consistent with the stock purchase agreement by and among the AUI shareholders and BHI, BHI purchased the AUI stock held by Persephone Trust for $64,328,160 in cash.

83.     Thereafter, the Persephone Trust used the proceeds from the sale of the AUI stock to repay Menzies the amounts owing under the promissory notes it had issued to Menzies when it acquired his remainder interest in the Menzies GRRTs.

84.     When filing his 2006 federal income tax returns in 2007, and in reliance upon the words and conduct of Defendants, including the Opinion Letters, Menzies did not report the sale of the $64 million AUI stock to BHI as a taxable event.  As Menzies had been informed by Defendants, the AUI stock was owned by the Persephone Trust at the time of sale, and not by himself, and furthermore the Persephone Trust had full tax basis in the AUI stock (and thus recognized little or no gain on disposition of the stock.)

85.     In or about October 2009, the Internal Revenue Service (the "IRS") advised Menzies of its intention to audit Menzies' 2006 tax filings.

86.     The IRS audit occurred from October 2009 through most of 2012.  Near the end of its audit, the IRS focused on BHI's purchase of the AUI stock from the Persephone Trust. Menzies explained to the IRS that he did not own the AUI stock at the time of sale and that he understood that the trust in any event had full tax basis of the stock as a result of the transactions he had entered into.  Menzies reasonably believed, and relied upon, the representations of Defendants and the Opinion Letters in explaining to the IRS why he did not report the AUI stock disposition in his personal tax filings.

87.     The IRS audit was substantially completed by December 2012.  Despite Defendants' representations to Menzies as to the legitimacy of the Tax Shelters, the IRS audit determined the Tax Shelters to be an unlawful tax avoidance scheme.

88.     As explained by the IRS: "It was determined Mr. Menzies' transfer of Applied Underwriters Inc. (AUI) stock to Grantor Retained Remainder Interest Trusts (GRRT's) did not

represent arm's length transactions.  As such, the 2006 disposition of AUI stock was actually a sale by Mr. Menzies which should have been characterized as a Long-Term Capital Gain."

89.     The IRS found that the transfer and substitution of assets and various trusts were designed as elements of an abusive tax shelter with "the primary purpose of the transactions… to disguise the ownership of the stock, inflate Mr. Menzies' basis, and allow him to evade the 2006 tax liabilities related to the stock sale."

90.     The IRS determined that Menzies, not the Persephone Trust, had sold the AUI stock to BHI for $64,328,160.  The IRS re-calculated the basis of the AUI stock as $19,436,324 on the date he was deemed to have sold the AUI stock to BHI.  On this basis, the IRS determined that Menzies failed to report $44,891,836 of capital gains from the sale of the AUI stock.

91.     On or about December of 2012, under threats from the IRS of large fines, severe penalties, civil actions and even potential criminal liability, Menzies agreed to settle with the IRS.  The agreed upon settlement with the IRS included paying $6,718,108 in capital gains tax for the disposition of the AUI stock to BHI, $1,343,621.60 in penalties and $2,365,472.38 in interest, for a total of $10,427,201.98.

92.     Menzies paid the settlement amount to the IRS in October of 2013.

93.     Subsequent to the settlement with the IRS, Menzies now knows that Defendants had actual knowledge of the affirmative misrepresentations and omissions of material fact set forth herein, or acted in reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

94.     Menzies now knows that the various steps assured to him by Defendants as necessary in creating the Tax Shelters were not deemed by the IRS to be independent steps in a lawful transaction.  Menzies now knows that the Tax Shelters were an Abusive Tax Avoidance

Scheme, and that Defendants promoted, marketed, and sold Menzies this scheme for the primary purpose of earning fees.  In fact, Menzies now knows that the IRS has previously identified similar transactions like those necessary to create the Tax Shelters as abusive tax schemes.

95.     In this regard, Menzies now knows, that one or more of Defendants made the following statements which were false and misleading, and which are attributable to each of the Defendants because they were made by persons or entities acting as agents of, or in furtherance of, the conspiracy:

a.      That the Tax Shelters were valid, legitimate, and legal under federal and state law;

b.      That the Tax Shelters were legitimate tax avoidance mechanisms and were not fraudulent tax shelters;

c.      That the Tax Shelters would not be subject to challenge by the IRS;

d.      That the Tax Shelters were in compliance with all applicable court procedural and legal rules for federal tax purposes;

e.      That the Tax Shelters were not subject to tax penalties;

f.      That the Tax Shelters were not subject to the sham transaction doctrine by the IRS;

g.      That the Tax Shelters were more likely than not to be upheld by the IRS;

h.      That Menzies could rely on the Opinion Letters to satisfy the IRS as to the propriety of the Tax Shelters, if audited;

i.      That the various trusts being formed to execute the Tax Shelters had a business purpose and economic substance;

j.      That the various loans and promissory notes being created in furtherance of the Tax Shelters had a business purpose and economic substance;

96.     In addition, the following material omissions were part of the fraud:

a.      Failing to disclose the true likelihood that the Tax Shelters would not provide the tax savings promised;

b.      Failing to disclose Defendants' Conspiracy and actual role in furtherance of the Tax Shelters;

c.      Failing to disclose that the Opinion Letters were not "independent" legal opinion letters;

d.      Failing to disclose that the Opinions Letters relied on factual assumptions that were known by the Defendants to be untrue; and

e.      Failing to revise, alter, and modify the advice and recommendations made to Menzies after the issuance of the Opinion Letters and after the IRS commenced its audit related to the Tax Shelters.

97.     In committing the wrongful acts alleged in this Complaint, the Defendants pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design to promote, sell and implement the Tax Shelters.  The Defendants also intentionally and knowingly aided and abetted and/or assisted each other in breach of their respective duties regarding their respective roles in falsely, fraudulently and misleadingly promoting, selling and implementing the Tax Shelters.  In taking such actions to substantially assist the commission of this wrongful conduct, each of the Defendants acted with knowledge of the primary wrongdoing, substantially assisted

25

the accomplishment of that wrongdoing, and was aware of his/its overall contribution to and in furtherance of the wrongdoing.

98.     Menzies now knows that each Defendant:

a.      Directly or indirectly engaged in a common plan, transaction and course of conduct described herein in furtherance of Defendants' Conspiracy and the Tax Shelters, in which they knowingly engaged in acts, transactions, practices and a course of business which operated as a fraud upon Menzies;

b.      Devised and implemented a well-planned sales strategy that focused on leveraging trust and confidence from Menzies in furtherance of Defendants' Conspiracy and the Tax Shelters;

c.      Intentionally concealed Defendants' Conspiracy from Menzies; and

d.      Fraudulently induced Menzies to participate in the Tax Shelters.

99.     In short, Menzies now knows that Defendants had a financial, business, and property interest in inducing him to enter the Tax Shelters, and to promise, opine, and assure him that the transactions would enable him to legally reduce and/or eliminate tax liability on the disposition of AUI stock.

100.    Menzies reasonably relied upon the material misrepresentations and omissions of Defendants in furtherance of Defendants' Conspiracy and the Tax Shelters.  Absent these misrepresentations and omissions, Menzies would not have engaged in the Tax Shelters, and consequently would not have suffered the damages asserted herein.

101.    Defendants had a duty to disclose to Menzies the truth about the Tax Shelters. Such disclosure was necessary so that their representations about the 2003 Tax Shelter and 2004

Tax Shelter would not be false or misleading.  The Defendants, however, never disclosed to Menzies that their representations to him were false or misleading, were intended for the sole purpose of generating fees.

102.    But for Defendants' conduct, including their fraudulent misrepresentations and omissions, all in effort to further Defendants' Conspiracy by selling to Menzies the services associated with the Tax Shelters, Menzies would not have: (1) paid Defendants substantial fees and expenses for unnecessary tax consulting services, (2) filed personal federal tax returns that were determined to be inaccurate by the IRS with respect to the disposition of the AUI stock, (3) incurred substantial costs to the IRS in penalties and interest arising out of the disposition of the AUI stock; and (4) engaged legal and other professional services to investigate and resolve the fraud perpetrated by Defendants.

103.    In addition to the costs identified above, the biggest cost to Menzies was the payment of over $6.7 million in taxes to the IRS arising from the capital gains tax imposed on the disposition of the AUI stock.  Rather than engage in the abusive Tax Shelters, Menzies could have, and would have, engaged in other legal tax savings opportunities related to the disposition of the AUI stock.

**COUNT I**
**VIOLATIONS OF RICO 18 U.S.C. § 1962(c)**
(Against all Defendants)

104.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

105.    At all relevant times, Plaintiff and each of the Defendants were and are "persons" within the meaning of 18 U.S.C. § 1961(3).

106.    This enterprise was not a specific legal entity, but rather may a union or group of individuals associated in fact..

107.    Defendants' Conspiracy is an association-in-fact for the common and continuing purpose described above, and which constitutes an enterprise ("Enterprise").  The Enterprise consisted of: (1) Seyfarth and Taylor; (2) Northern Trust and the Individual Northern Trust Conspirators; (3) Christiana Bank and Freney; and (4) Euram Bank and the Individual Euram Bank Conspirators.

108.    The Enterprise engaged in interstate and foreign commerce and activities which affect interstate and foreign commerce by providing financial, legal, and estate planning services across state lines and between countries.

109.    The Defendants that make up the Enterprise, either individually or through their agents, formed the Enterprise to participate in Defendants' Conspiracy, whose main purpose was to generate income by a common plan, transaction and course of conduct described herein in connection with the design, promotion, and sale of the Tax Shelters, pursuant to which each Defendant knew or recklessly engaged in acts, transactions, practices and a course of conduct of business which operated as a fraud upon Menzies.

110.    While Defendants participated in the Enterprise and were part of it, the Defendants also had and have an existence separate and distinct from the Enterprise.

111.    The Enterprise had an ascertainable structure separate and apart from the pattern of racketeering activity in which Defendants engaged in, directing and controlling the conduct of the Enterprise in furtherance of Defendants' Conspiracy.

112.    Defendants' control and participation in the Enterprise was necessary for the successful operation of Defendants' Conspiracy, which included, among other things:

a.      Establishing a common plan to share in the income generation received from selling and promoting the Tax Shelters;

b.      Establishing a common plan as to how to market the Tax Shelters to participants; and

c.      Concealing the true nature of the relationship between Defendants and any participants, including Menzies.

113.      Each Defendant played an important role in the success of the Enterprise:

a.      Seyfarth and Taylor were responsible for providing legal documentation and providing the Opinion Letters that purported to approve the Tax Shelters;

b.      Northern Trust was responsible for promoting the Abusive Tax Avoidance Scheme to participants and coordinating Defendants roles and responsibilities in implementing the Tax Shelters; and

c.      Christiana Bank was responsible for creating the trust documents and operating as trustees of the Tax Shelters.

114.      Defendants conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity.

115.      18 U.S.C. 1961(1) provides that "racketeering activity" is limited to the specific acts statutorily enumerated, including mail and wire fraud under 18 U.S.C. § 1341 (mail) and 18 U.S.C. § 1343 (wire). As set forth herein, Defendants engaged in conduct violating each of these laws to effectuate Defendants' Conspiracy and to defraud Menzies in furtherance of the Tax Shelters.

116.    For the purpose of executing and/or attempting to execute the Tax Shelters to defraud and to obtain money by means of false pretenses, representations, or promises, the Defendants, in violation of 18 U.S.C. § 1341 placed in post offices and/or in authorized repositories for mail matter and things to be sent or delivered by the Postal Service and received matter and things therefrom including but not limited to contracts, loan documents, promissory notes, trust documents, instructions, correspondence, opinion letters, and other related documents.   These acts were done intentionally and knowingly with the specific intent to advance Defendants' Conspiracy, or with the knowledge that the use of the mails would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.   Defendants carried out their scheme in different states and different countries, and could not have done so unless they used the Postal Service or other private/commercial interstate and/or foreign carriers.

117.    For the purpose of executing and/or attempting to execute Tax Shelters to defraud and to obtain money by means of false pretenses, representations, or promises, the Defendants, in violation of 18 U.S.C. § 1343 transmitted, caused to be transmitted and/or received by means of wire communication in interstate and foreign commerce, various writings, signs and signals. These acts were done intentionally and knowingly with the specific intent to advance Defendants' Conspiracy, or with the knowledge that the use of wire communications would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended.   Defendants carried out their scheme in different state and different countries, and could not have done so unless they used wire communication in interstate and foreign commerce.

118.    For purposes of both mail and wire fraud, the matter and things sent by Defendants by Postal Service, private or commercial carrier and by wire across interstate lines and to and from foreign countries include, among other things:

      a.    Contracts that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Tax Shelters;

      b.    Loan documents that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Tax Shelters;

      c.    Structured notes that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Tax Shelters;

      d.    Promissory notes that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Tax Shelters;

      e.    Trust documents that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Tax Shelters;

      f.    Correspondence from Defendants that falsely and fraudulently misled Menzies about the activities taken and to be undertaken in furtherance of the Tax Shelters;

      g.    Other matter and things sent through or received from the Postal Service, private or commercial carrier and by wire across interstate lines and to and from foreign countries in furtherance of the Tax Shelters.

119.    At least two of the predicate acts of mail and wire fraud identified herein were committed within the past ten years.

120.    Defendants' misrepresentations, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Menzies and obtaining their

property for Defendants' gain.  Defendants either knew or recklessly disregarded the fact that their misrepresentations and omissions described herein were material, and Menzies relied upon the misrepresentations and omissions described herein.

121.    The Defendants made continual use of mail and wire transmissions to effectuate their fraudulent scheme, and additionally, transmitted numerous specific fraudulent statements to Plaintiff by mail or wire, as described herein.

122.    As a result, Defendants have obtained money and property belonging to Menzies and Menzies has been injured in his property by Defendants' overt acts of mail and wire fraud.

123.    Defendants, each of whom are persons associated with the Enterprise, did knowingly and willfully conduct or participate in the affairs of the Enterprise through a "pattern of racketeering activity" pursuant to 18 U.S.C. §§ 1961(1), 1961(5), and 1962(c).  As set forth above, Defendants committed and/or conspired to aid and abet a transaction in furtherance of Defendants' Conspiracy and the Tax Shelters for at least two such acts of racketeering activity, as described above, within the past ten years.  Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and methods of commission, and had similar results impacting upon unwitting participants, including Menzies.

124.    The multiple acts of racketeering activity committed and/or conspired to or aided and abetted by Defendants, as described above, were related to each other and amount to and pose a threat of future racketeering activity, and therefore, constitute a "pattern of racketeering."

125.    This claim for relief arises under 18 U.S.C. § 1962(c) which provides that "it shall be unlawful for any person … associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity…."

126.    As set forth above, Defendants have violated 18 U.S.C. §1962(c) by conducting or participating directly or indirectly in the conduct of the affairs of the Enterprise through a pattern of racketeering.   Through the fraudulent and wrongful conduct described herein, Defendants deprived Menzies of property rights.   In order to successfully execute their scheme in the manner set forth herein, Defendants had a common plan and system to market and promote the Tax Shelters to participants such as Menzies.   The Enterprise was the vehicle for the common plan and system to be effectuated.

127.    In carrying out the overt acts and fraudulent scheme described herein, Defendants engaged in conduct in violation of federal laws, and specifically in violation of 18 U.S.C. §§ 1341 and 1343.

128.    As a direct and proximate result, Menzies has been injured in his property by the predicate acts which make up Defendants' pattern of racketeering activity through the Enterprise by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities; and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.   In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law, punitive damages, and such other and further relief as this Court deems just and proper.

33

**COUNT II**
**CONSPIRACY TO VIOLATE RICO PURSUANT TO 18 U.S.C. § 1962(d)**
(Against all Defendants)

129.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and Paragraphs 105 through 124 and incorporates them by reference herein as if fully set forth.

130.    This claim for relief arises under 18 U.S.C. § 1962(d) which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."

131.    In violation of 18 U.S.C. § 1962(d), Defendants have, as set forth above, conspired to violate 18 U.S.C. § 1962(c).  The conspiracy commenced in at least as early as 2002 and continued through the implementation of the Tax Shelters.  The object for the conspiracy was to obtain funds from Menzies in furtherance of Defendants' Conspiracy in promoting and marketing the Tax Shelters.

132.    As set forth above, each of the Defendants knowingly, willingly, and unlawfully agreed and combined to conduct or participate directly or indirectly, in the conduct of the affairs and activities of the Enterprise through a pattern of racketeering activity, including acts of mail and wire fraud under  18 U.S.C. §§ 1341 and 1343.  Defendants objectively manifested their agreement to the commission of the substantive RICO violations by at least one member of the conspiracy by words or acts, as detailed above.

133.    As set forth above, each Defendant committed at least one overt act of racketeering activity or other wrongful activity in furtherance of such conspiracy including systematic fraudulent practices designed to defraud Menzies of money and other property interest.

134.     The nature of the above-described acts, material misrepresentations, and omissions in furtherance of the conspiracy gives rise to an inference that the Defendants not only agreed to conspire to violate 18 U.S.C. §1962(c), but that they were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity.

135.     Absent Defendants' conspiracy and joint efforts, Defendants' Conspiracy would not be successful.  Acting jointly, Defendants have had greater power and influence, and have been successfully engaged in the activities of promoting and transacting the steps of the Tax Shelters.

136.     As a direct and proximate result, Menzies has been injured in his property by the predicate acts which make up Defendants' pattern of racketeering activity through the Enterprise by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities; and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.  In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law, punitive damages, and such other and further relief as this Court deems just and proper.

**COUNT III**
**FRAUDULENT MISREPRESENTATION**
(Against all Defendants)

137.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

138.    As stated above, Defendants made material misrepresentations in connection with the Tax Shelters, including:

    a.    That the Tax Shelters were valid, legitimate, and legal under federal and state law;

    b.    That the Tax Shelters were legitimate tax avoidance mechanisms and were not fraudulent tax shelters;

    c.    That the Tax Shelters would not be subject to challenge by the IRS;

    d.    That the Tax Shelters were in compliance with all applicable court procedural and legal rules for federal tax purposes;

    e.    That the Tax Shelters were not subject to tax penalties;

    f.    That the Tax Shelters were not subject to the sham transaction doctrine by the IRS;

    g.    That the Tax Shelters were more likely than not to be upheld by the IRS;

    h.    That Menzies could rely on the Opinion Letters to satisfy the IRS as to the propriety of the Tax Shelters, if audited;

    i.    That the Tax Shelters would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

    j.    That the various trusts being formed to execute the Tax Shelters had a business purpose and economic substance;

36

      k.     That the various loans and promissory notes being created in furtherance of the Tax Shelters had a business purpose and economic substance;

139.    In addition, the following material omissions were part of the fraud:

      a.     Failing to disclose the true likelihood that the Tax Shelters would not provide the tax savings promised;

      b.     Failing to disclose Defendants' Conspiracy and actual role in furtherance of the Tax Shelters;

      c.     Failing to disclose that the Opinion Letters were not "independent" legal opinion letters;

      d.     Failing to disclose that the Opinion Letters relied on factual assumptions that were known by the Defendants to be untrue; and

      e.     Failing to revise, alter, and modify the advice and recommendations made to Menzies after issuing the Opinion Letters and after the IRS began its audit related to the Tax Shelters.

140.    These misrepresentations and omissions of Defendants were known to Defendants to be false and untrue.

141.    At no point prior to the IRS settlement did Menzies know that the Defendants were conveying false, misleading, or omitted facts that comprised Defendants representations as to the efficacy of the Tax Shelters.

142.    The foregoing misrepresentations and omissions were material to Menzies, and Menzies reasonably relied upon such representations and omissions in authorizing Defendants to perform the various transactions involved in the Tax Shelters.

143.     As detailed above, the foregoing material misrepresentations and omissions were made to Menzies by the Defendants intentionally, knowingly, and/or with reckless disregard for the truth.

144.     As a result of the foregoing material misrepresentations and omissions, Menzies authorized Defendants to perform the various transactions that comprised the Tax Shelters under the belief that AUI stock, when sold, would not be subject to capital gains tax.

145.     As a direct and proximate result, Menzies has been injured in his property by the fraudulent misrepresentations by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in back taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities; and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.   In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law, punitive damages, and such other and further relief as this Court deems just and proper.

**COUNT IV**
**CIVIL CONSPIRACY**
(Against all Defendants)

146.     Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

147.     Defendants knowingly acted in concert with one another to market and implement the Tax Shelters in furtherance of Defendants' Conspiracy.  In doing so, Defendants acted with full knowledge and awareness that the Tax Shelters were designed to give the false impression that a complex series of financial transactions were legitimate business transactions which had economic substance, when they in fact lacked the features necessary for a successful tax strategy.

148.     Defendants acted in their respective roles as described above in furtherance of the Defendants' Conspiracy by working in coordination with each other, communicating with each other and conspiring with each other in a commonly understood and accepted plan of action, to wrongfully advise Menzies about his tax obligations pursuant to the Tax Shelters for the purpose of effectuating Defendants' Conspiracy.  In other words, Defendants acted as agents of one another in furtherance of their conspiracy and the Defendants' Conspiracy when dealing marketing, promoting, selling and implementing the Tax Shelters.

149.     At no time prior to the IRS settlement did Menzies know that the Defendants were conveying false, misleading, or omitted facts that comprised Defendants representations as to the efficacy of the Tax Shelters.

150.     The foregoing misrepresentations and omissions were material to Menzies, and Menzies reasonably relied upon such representations and omissions authorizing the Defendants to perform the various transactions that formed the Tax Shelters.

151.    There was a meeting of the minds between the Defendants to commit the unlawful acts alleged herein, and for each Defendant to operate as an agent for each other in furtherance of Defendants' Conspiracy and the Tax Shelters.  This conspiracy to commit these unlawful, overt acts was intended to harm and continue to harm Menzies.  One or more of the overt acts described above were in furtherance of the conspiracy.  Said acts were tortious and unlawful, and engaged in solely for the purpose of Defendants' Conspiracy.

152.    Defendants conduct was deliberately done with the intent to induce Menzies to enter into the Tax Shelters in furtherance of Defendants' Conspiracy.

153.    As a direct and proximate result of Defendants' conspiracy to defraud Menzies, Menzies has been injured by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in back taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities; and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.  In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law, punitive damages, and such other and further relief as this Court deems just and proper.

**COUNT V**
**JOINT ENTERPRISE LIABILITY**
(Against all Defendants)

154.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

155.    Defendants entered into a joint enterprise for the purpose to effectuate Defendants' Conspiracy and to promote, sell, and implement the Tax Shelters.

156.    Each of the Defendants participated in and approved decisions made by the joint enterprise related to the promotion, sale, and implementation of the Tax Shelters.

157.    Defendants benefited financially from the common purpose of the joint enterprise, as intended by Defendants' Conspiracy, by receiving a share of the proceeds from the promotion, sale, and implementation of the Tax Shelters to Menzies.

158.    As a result, Defendants are jointly and severally liable as partners, joint ventures or members of a joint enterprise, for the tortious conduct of any one of their partners or joint ventures related to the promotion, sale, and implementation of the Tax Shelters to Menizes.

159.    As a direct and proximate result of Defendants' joint venture and wrongful conduct, Menzies has been injured in his property by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in back taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities; and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.  In addition, because Defendants' actions were outrageous and committed with wanton and willful disregard and/or reckless indifference for the rights of Menzies, Menzies seeks punitive damages against Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law, punitive damages, and such other and further relief as this Court deems just and proper.

**COUNT VI**
**<u>NEGLIGENT MISREPRESENTATION</u>**
**(In the Alternative)**
(Against Northern Trust and Christiana Bank)

160.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

161.    Defendants knew or should have known that the followings statements related to the efficacy of the Tax Shelters were untrue:

      a.    That the Tax Shelters were valid, legitimate, and legal under federal and state law;

      b.    That the Tax Shelters were legitimate tax avoidance mechanisms and were not fraudulent tax shelters;

      c.    That the Tax Shelters would not be subject to challenge by the IRS;

      d.    That the Tax Shelters were in compliance with all applicable court procedural and legal rules for federal tax purposes;

      e.    That the Tax Shelters were not subject to tax penalties;

      f.    That the Tax Shelters were not subject to the sham transaction doctrine by the IRS;

      g.    That the Tax Shelters were more likely than not to be upheld by the IRS;

      h.    That Menzies could rely on the Opinion Letters to satisfy the IRS as to the propriety of the Tax Shelters, if audited;

42

i.     That the Tax Shelters would substantially minimize, if not eliminate, all capital gains tax on the disposition of the AUI stock;

j.     That the various trusts being formed to execute the Tax Shelters had a business purpose and economic substance;

k.     That the various loans and promissory notes being created in furtherance of the Tax Shelters had a business purpose and economic substance;

162.     In addition, Defendants should have disclosed the following material omissions:

a.     Failing to disclose the true likelihood that the Tax Shelters would not provide the tax savings promised;

b.     Failing to disclose Defendants' Conspiracy and actual role in furtherance of the Tax Shelters;

c.     Failing to disclose that the Opinion Letters were not "independent" legal opinion letters;

d.     Failing to disclose that the Opinion Letters relied on factual assumptions that were known by the Defendants to be untrue; and

e.     Failing to revise, alter, and modify the advice and recommendations made to Menzies after issuing the Opinion Letters and after the IRS began its audit related to the Tax Shelters.

163.     Defendants did not exercise reasonable care or competence in obtaining or communicating the information contained in these false representations as to propriety of the Tax Shelters.

164.     Defendants had a duty to make sure that the representations made to Menzies, including omissions of fact not made to Menzies, as to efficacy of the Tax Shelters was in fact

true.  Defendants' duty arises out of their: (1) professional relationship with Menzies (including fiduciary relationship), (2) superior knowledge and expertise in tax matters, and (3) their complete control over the transactions which Menzies authorized in furtherance of the Tax Shelters.

165.    The foregoing misrepresentations and omissions were material to Menzies, and Menzies reasonably relied upon such representations and omissions in engaging in the various transactions that formed the Tax Shelters.

166.    Defendants breached their duties owed to Menzies, by making material misrepresentations of omissions as to the legality of the Tax Shelters, as detailed above.

167.    As a direct and proximate result of Defendants' negligent misrepresentation, Menzies has been injured by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in back taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities; and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law and such other and further relief as this Court deems just and proper.

## COUNT VII
## BREACH OF FIDUCIARY DUTY
### (In the Alternative)
(Against Northern Trust)

168.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

169.    As Menzies' financial advisor, Northern Trust, through its agents, the Individual Northern Trust Conspirators, Menzies was owed fiduciary duties of honesty, loyalty and care. Northern Trust had the duty to carefully assess Menzies' circumstances and to properly advance Menzies' wealth management and estate planning needs related to tax savings programs.

170.    Northern Trust had both superior knowledge and influence over Menzies and complete control over the handling of the outcome of the Tax Shelters on behalf of Menzies.

171.    Menzies relied on Northern Trust to provide him with sound wealth management advice when promoting and enticing Menzies to engage in the Tax Shelters.

172.    Northern Trust and its agents breached their fiduciary responsibilities to Menzies by violating the duty of honesty, loyalty, and care by, among other acts, failing to advise Menzies fully as to true relationship with the other Defendants, failing to disclose to Menzies the actual roles of each Defendant in furtherance of Defendants' Conspiracy and the Tax Shelters, and by failing to explain the details of the Tax Shelters to ensure that Menzies understood the tax strategy and its risks before

173.    As a direct and proximate result of the negligence and carelessness of Northern Trust as set forth above, Menzies has been injured by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in back taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities;

and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.

WHEREFORE, Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Northern Trust in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law and costs, and such other and further relief as this Court deems just and proper.

**COUNT VIII**
**<u>BREACH OF FIDUCIARY DUTY</u>**
**(In the Alternative)**
(Against Christiana Bank)

174.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

175.    Christiana Bank through its agent Freney, as trustee of the various trusts described above, was a fiduciary of Menzies, and thus owed Menzies the duties of honesty, loyalty and care.

176.    Christiana Bank breached its fiduciary responsibilities to Menzies by violating the duty of honesty, loyalty, and care by, among other acts, failing to disclose to Menzies the actual roles of each Defendant in furtherance of Defendants' Conspiracy and the Tax Shelters, and failing to explain the details of the Tax Shelters to ensure that Menzies understood the tax strategy and its risks before inducing Menzies to enter into the various transactions that made up the Tax Shelters.

177.    As a direct and proximate result of the negligence and carelessness of Christiana Bank as set forth above, Menzies has been injured by having: (1) paid Defendants substantial fees and expenses in furtherance of the Tax Shelters; (2) paid the IRS millions of dollars in back taxes, penalties, and interest; (3) foregone other legitimate and lawful tax savings opportunities;

46

and (4) engaged legal and professional services to investigate and resolve the fraud perpetrated by Defendants.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Christiana Bank in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law and costs, and such other and further relief as this Court deems just and proper.

### COUNT IX
### UNJUST ENRICHMENT
(Against all Defendants)

178.    Plaintiff realleges each and every allegation set forth in Paragraphs 1 through 103 and incorporates them by reference herein as if fully set forth.

179.    As a direct and proximate result of Defendants' misconduct as alleged herein, Defendants were enriched, at the expense of Menzies, through Menzies' payment of substantial fees in furtherance of the Tax Shelters.

180.    Defendants, through their wrongful conduct described above, have reaped substantial profit and revenue from Menzies by their wrongful and unlawful conduct.

181.    The enrichment by Defendants of this substantial profit and revenue from Menzies was unjust and at the expense of Menzies.

182.    Under the circumstances, it would be against equity and good conscience to permit Defendants to retain the ill-gotten benefits that they received from Menzies, as Menzies incurred substantial damages as a result of the misrepresentation and omissions related to the efficacy of the Tax Shelters, such as paying the IRS millions of dollars in back taxes, penalties, and interest, and having to pay new advisors, consultants, and lawyers to correct the unlawful activity occasioned on Menzies by Defendants' conduct.

183.    Therefore, any fees and expense paid to Defendants by Menzies in furtherance of Defendants' Conspiracy and the Tax Shelters should be returned to Menzies.

**WHEREFORE,** Plaintiff, Steven Menzies, prays that judgment be entered in its favor and against Defendants in an amount to be determined at trial, plus prejudgment interest, interest on its judgment at the highest rate permitted by applicable federal law and costs, and such other and further relief as this Court deems just and proper.

### JURY TRIAL DEMANDED

Plaintiff Steven Menzies requests a jury trial on all questions of fact raised by the Complaint.

DATED this 17th day of April, 2015

                                        **STEVEN MENZIES**


                                        By: /s/  Jeffrey B. Charkow
                                            One of his attorneys

                                            Jeffrey B. Charkow
                                            Daniel A. Dorfman
                                            HARRIS WINICK HARRIS LLP
                                            333 W. Wacker Drive
                                            Suite 2060
                                            Chicago, IL 60606
                                            (312) 662-4600