IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

STEVEN MENZIES

      *Plaintiff*,

  v.

SEYFARTH SHAW LLP; GRAHAM
TAYLOR; and CHRISTIANA BANK &
TRUST COMPANY

      *Defendants*.

No. 1:21-cv-00249-SB

---

Daniel Charles Herr, LAW OFFICE OF DANIEL C. HERR LLC, Wilmington, Delaware.

      *Counsel for Plaintiff.*

Jennifer Marie Kinkus, William Edward Gamgort, YOUNG, CONAWAY, STARGATT & TAYLOR LLP, Wilmington, Delaware.

      *Counsel for Defendants.*

**MEMORANDUM OPINION**

September 29, 2023

---

BIBAS, *Circuit Judge*, sitting by designation.

    Some deadlines are rigid and fixed; others are flexible. Under Delaware law, the deadline to sue may be extended when an injury is inherently unknowable. But that extension ends when a plaintiff has enough facts to prompt an investigation that would reveal his injury. Steven Menzies says Christiana Bank breached its fiduciary

duties to him. But he should have started investigating Christiana more than three years before he filed suit. Because he waited too long, I grant Christiana's motion for summary judgment.

## I. THE FLAWED TAX SHELTER

Menzies co-founded a successful insurance firm. His company's success caught the eye of Berkshire Hathaway. When it decided to buy his company, Menzies stood to earn millions from the sale. But selling his company's shares would ordinarily cost him millions in taxes. So Menzies employed the services of Northern Trust, a tax-planning firm, to find a way around this. It proposed a transaction to eliminate Menzies's tax liability *legally*. D.I. 335-2, at 4–24. The proposal involved creating several trusts and passing assets among them like a game of hot potato. *See generally id.*

Menzies sought a second opinion from a tax lawyer at the law firm Seyfarth Shaw. D.I. 332-1, at 99; D.I. 335-2, at 30–35. The lawyer told Menzies twice that "[t]here is … a greater than 50 percent likelihood that the tax [strategy] … will be upheld if challenged by the IRS." D.I. 332-1, at 53, 91.

With his legal concerns put to rest, Menzies moved forward with the tax-avoidance strategy. Christiana Bank drafted the trust documents. D.I. 335-2, at 150, 199. And Menzies hired it to serve as a trustee for the newly created trusts. *Id.* at 153–54. Together, they executed three trust agreements in 2003 and one more in 2004. *Id.* at 156–66; D.I. 332-1, at 224–35, 236–46; D.I. 332-2, at 2–13.

Having dotted the i's and crossed the t's, it was time for the key move. One of the trust agreements gave Menzies the power to substitute assets into and out of the trusts. D.I. 335-2, at 18. Using this power, he directed Christiana to substitute assets

twice. D.I. 332-2, at 40–49. He described these substitutions as the "key" to the tax strategy. 2d Am. Compl. ¶ 80, D.I. 165, at 20–21.

Eventually, Menzies's company's shares ended up in the Persephone Trust. That trust sold his stock to Berkshire Hathaway in 2006. Later that year, Christiana contacted Menzies about returning his proceeds through a refund and release agreement. Menzies agreed, and Christiana returned his proceeds. But neither Menzies nor the trust reported the sale as a taxable event on their tax returns. D.I. 335-2, at 256–90.

Once the dust settled, the scheme seemed successful. Menzies had avoided paying taxes on a $64 million stock sale. But a few years later, the IRS came knocking. It audited Menzies's tax returns and disregarded the trust scheme because its "primary purpose was to avoid paying tax on the stock sale." D.I. 332-1, at 2, 215. The IRS observed that "[n]o one reported the actual sale of [the company stock] originally owned by Mr. Menzies, and Mr. Menzies ultimately received the proceeds from the sale of [his stock] basically, tax free." *Id.* at 222. In September 2012, it sent its official findings about Menzies's tax deficiencies to him. D.I. 336, at 2. Later that year, Menzies settled with the IRS for more than $10,000,000. D.I. 337, at 46–125; Pl.'s Resp. Br. 7–8.

On April 17, 2015, Menzies sued Seyfarth, the Seyfarth tax lawyer, Northern Trust, and Christiana. D.I. 1. Over the last eight years, claims and defendants have fallen like dominoes. Menzies has only one remaining claim: a breach-of-fiduciary-duty claim against Christiana Bank.

3

Christiana now moves for summary judgment. It argues that the statute of limitations bars Menzies's claim, that Menzies thrice released any claims against Christiana, and that Menzies cannot show a breach of duty or causation. Because Christiana is right on the first issue, I need not address the other two.

On this summary-judgment motion, I view the facts in the light most favorable to Menzies. *Lamont v. New Jersey*, 637 F.3d 177, 179 n.1 (3d Cir. 2011). Summary judgment is appropriate if Christiana "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is "genuine" if a reasonable jury could resolve it in favor of either side. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). And a fact is "material" if it "could affect the outcome." *Lamont*, 637 F.3d at 181. Christiana has met its burden.

## II. MENZIES HAS ONLY ONE CLAIM

Before reaching Christiana's arguments, I must address a threshold issue. The parties dispute whether Menzies can pursue different theories of breach of fiduciary duty. I previously dismissed Menzies's fraud-based claims against Christiana, but I let his fiduciary-duty claim continue. That claim survived because Menzies had alleged that Christiana failed to tell him it had consulted a lawyer about whether certain transactions were reportable. D.I. 284, at 8–9.

Menzies now argues that Christiana breached its fiduciary duty in four ways: (1) by failing to disclose it consulted a lawyer about the reportability of the transaction, (2) by failing to disclose its preexisting relationships with Euram Bank (which developed the scheme), Seyfarth, and the Seyfarth tax lawyer, (3) by failing to make

4

necessary disclosures before inducing Menzies to engage in a self-interested transaction, and (4) by acting without regard for Menzies's interests. Pl.'s Resp. Br. 8 & n.2. Though Menzies presents these as if they were new claims, they are not. *Id.* at 9–10. Instead, they are different *theories* for proving the same *claim*—breach of fiduciary duty. Indeed, these theories arise from the same transaction, and the facts substantially overlap. *Cf. LaPoint v. AmerisourceBergen Corp.*, 970 A.2d 185, 193 (Del. 2009) (explaining the transactional approach to res judicata).

Resisting this conclusion, Christiana likewise conflates claims and theories. It says this Court permitted a breach-of-fiduciary-duty claim only on Menzies's theory that Christiana allegedly failed to disclose the lawyer consultation. Def.'s Reply Br. 4. True, that was the *theory* on which I allowed him to proceed. But I permitted his breach-of-fiduciary-duty *claim* to proceed. D.I. 284, at 2. And I did not limit Menzies to just one theory of how Christiana breached its fiduciary duty. So he may present these related theories.

### III. MENZIES FILED HIS CLAIM TOO LATE

At the motion-to-dismiss stage, I held that Delaware law governs Menzies's fiduciary-duty claim. Neither party disagrees. So I continue to apply Delaware law.

**A. Menzies's cause of action accrued more than three years before he sued Christiana**

Delaware law provides a three-year statute of limitations for fiduciary-duty claims. Del. Code Ann. tit. 10, § 8106(a) (West 2014). A claim accrues under that statute "at the time of the wrongful act, even if the plaintiff is ignorant of the cause of action." *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

Menzies did not file his suit within the three-year period. He says Christiana committed its many wrongful acts in 2003 and 2004. *See* Pl.'s Resp. Br. 3–7. Yet he did not bring his claim against Christiana until April 17, 2015. D.I. 1. Ordinarily, this delay would doom his claim.

**B. The clock stopped until Menzies had inquiry notice of his injury**

But an exception applies. Menzies's time to sue tolled if his "injury [was] inherently unknowable" and he was "blamelessly ignorant of the wrongful act and the injury complained of." *Wal-Mart Stores*, 860 A.2d at 319 (internal quotation marks omitted). And here, at first, there were no "objective or observable factors … that might have put [Menzies] on notice of [his] injury." *In re Tyson Foods, Inc.*, 919 A.2d 563, 584–85 (Del. Ch. 2007). Christiana does not dispute that the exception applies to Menzies. It just disputes how much time the exception added.

The application of a tolling exception does not end the inquiry. The clock restarts when "a plaintiff has notice of facts from which the basis for the cause of action could have been discovered by the exercise of reasonable diligence." *Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.*, 2019 WL 6726836, at *9 (Del. Super. Ct. Dec. 4, 2019) (internal quotation marks omitted), *aff'd*, 247 A.3d 674 (Del. 2021); *accord Coleman v. PricewaterhouseCoopers, LLC*, 854 A.2d 838, 842 (Del. 2004). "Once a plaintiff is on notice of facts that should raise red flags of wrongdoing, she is obliged to diligently investigate and to file within the limitations period as measured from that time." *Murray v. Rolquin*, 2023 WL 2421687, at *11 (Del. Ch. Mar. 9, 2023) (internal quotation marks omitted).

So for the statute of limitations to start, a plaintiff does not have to actually know about the wrongdoing; he need only have access to enough knowledge to suspect wrongdoing. Delaware courts call this "inquiry notice." *Ocimum Biosolutions,* 2019 WL 6726836, at *9. Inquiry notice does not require "full or complete knowledge of the extent of [a plaintiff's] claims," *id.* at *12 & n.116 (collecting cases), because the tolling exceptions are "narrow and designed to prevent injustice," *Murray,* 2023 WL 2421687, at *11 (internal quotation marks omitted). But determining when a party was on inquiry notice is fact-intensive. *See Isaacson, Stopler & Co. v. Artisans' Sav. Bank*, 330 A.2d 130, 133–34 (Del. 1974). So summary judgment based on inquiry notice is appropriate when a "red flag" exists that "clearly and unmistakably'" would lead a reasonable person to investigate and discover the basis of his cause of action. *Boerger v. Heiman,* 965 A.2d 671, 675 (Del. 2009) (internal quotation marks omitted); *Ocimum Biosolutions,* 2019 WL 6726836, at *8.

**C. Menzies was on inquiry notice no later than March 2012**

Keeping these standards in mind, I must determine when Menzies was on inquiry notice of his claim. His claim has only two formal elements: (1) Christiana owed him a fiduciary duty, and (2) it breached that duty. *See Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 840–41 (Del. Ch. 2022). Christiana owed Menzies a fiduciary duty because it was an independent trustee. Del. Code Ann. tit. 12, § 3806(*l*) (West 2022). So inquiry notice depends on when Menzies "ha[d] facts sufficient to make [him] suspicious or that ought to [have] ma[d]e [him] suspicious" that Christiana had breached that duty. *Ocimum Biosolutions*, 2019 WL 6726836, at *10; *see also Coleman*, 854 A.2d at 842. Because the parties agree on almost all the relevant facts, this issue is

7

ripe for summary judgment. *See Davis v. 24 Hour Fitness Worldwide, Inc.*, 2014 WL 4955502, at *5 (D. Del. Sept. 30, 2014).

Christiana offers at least three possible dates for when the clock started running. First, it says Menzies was on inquiry notice in 2004, when his business partner handed him an opinion that the transaction was fraudulent. Next, it argues that the clock started running in January 2010. Finally, Christiana says Menzies was on inquiry notice no later than March 2012. I address each in turn.

*2004 Opinion Letter*. Menzies's longtime friend and business partner testified that around 2004, he "believe[d]" he gave Menzies a copy of an opinion letter from a tax lawyer at Holland & Knight. D.I. 332-2, at 24–26. That letter convinced Menzies's business partner not to go through with the tax-avoidance scheme. *Id.* But Christiana never introduced the letter into evidence, and Menzies submitted a sworn statement that he never received such a letter. D.I. 335-2, at 181–82. So there is a genuine factual dispute about whether he received the opinion letter. And I cannot find that he was on inquiry notice in 2004.

*January 2010*. Christiana points to three events that had happened by January 2010 and put Menzies on inquiry notice. First, the IRS notified Menzies that it was auditing his 2006 tax return. D.I. 332-1, at 2. And it specifically cited the section of his tax returns dealing with capital gains. *Id.* Second, and in response, Menzies hired two lawyers to represent him through the audit. *Id.* at 109. Third, Menzies's lawyer sent a letter to the managing partner at Seyfarth Shaw—the law firm that said that the tax strategy was probably legal. *Id.* at 15–16.

8

In that letter, Menzies's lawyer explained that he had discovered disturbing information about the Seyfarth tax lawyer who had written the legal opinions for Menzies. The letter mentioned that the Seyfarth tax lawyer had been convicted in federal court for "devis[ing], market[ing], and implement[ing] a tax shelter … to assist others in evading income taxes." *Id.* More pointedly, that lawyer had admitted to preparing "tax opinion letters with fraudulent misrepresentations." *Id.* The letter added that Menzies "has recently been advised that he is being audited by the Internal Revenue Service for 2006, 2007, and 2008, with 2006 involving the … [t]rusts." *Id.* Menzies's lawyer mentioned the trusts to make "the managing partner of Seyfarth aware … that Menzies was being audited as a result of that transaction for which [the Seyfarth tax lawyer] had opined on two separate occasions." *Id.* at 156.

These events likely put Menzies on inquiry notice. The red flags about the tax-avoidance scheme were "clear[ ] and unmistakable[ ]." *Boerger*, 965 A.2d at 675 (internal quotation marks omitted). The IRS had started auditing Menzies's tax returns, and his lawyer knew the audit concerned the trusts. D.I. 332-1, at 156. Plus, the lawyer who had given Menzies a tax opinion was convicted of tax fraud for preparing "tax opinion letters with fraudulent misrepresentations." *Id.* at 15. Those events should have prompted a reasonable person to investigate whether Christiana and the other key players in the scheme had legal concerns about the strategy. *Ocimum Biosolutions*, 2019 WL 6726836, at *10.

But Menzies and his lawyers did not investigate Christiana then. Had he or his lawyers done so, he likely would have found the facts necessary for his breach-of-

9

fiduciary-duty claim or had a potential claim for fraudulent concealment. *See In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7–8 (Del. Ch. July 17, 1998), *aff'd*, 725 A.2d 441 (Del. 1999). So the clock on his breach-of-fiduciary-duty claim likely started running by January 2010.

*March 2012*. But even if the clock had not started running by then, it had by March 2012. After receiving the IRS's audit notice, Menzies's lawyer sent a letter to the IRS investigator. D.I. 332-1, at 182–83. That letter referred to a phone call with the IRS, which involved "questions regarding the installment sales in 2003 and 2004." *Id.* Menzies's lawyer testified that these installment sales were the asset transfers between the trusts. *Id.* at 157. And those transfers were the ones that Menzies had directed Christiana to carry out. D.I. 332-2, at 40–49.

In March 2011, Menzies's lawyer researched whether Menzies could claim (as he now does) that he "relied in good faith on professional advisers." D.I. 332-1, at 201. One year later, the IRS sent Menzies its initial findings in a preliminary lead sheet. Among other things, it stated: (1) The Seyfarth tax lawyer's "[o]pinion [l]etters did not address the actual amounts of Gain or Loss that should have been or was reported." (2) "[H]is basis in [his company's] stock is being set at $-0-." (In other words, the tax-avoidance strategy had set the taxable value of his investment in his company's stock at zero dollars. So when his stock was sold, he did not incur capital-gains-tax liability.) (3) "[N]o one reported the actual sale of the … stock originally owned by Mr. Menzies, and Mr. Menzies ultimately received the proceeds from the sale of [his company's] stock, basically, tax free." *Id.* at 222.

These undisputed facts are clear and unmistakable red flags about the tax-avoidance scheme. *See Gen-E, LLC v. Lotus Innovations, LLC*, 2022 WL 2063307, at *2–3 (Del. Super. Ct. Apr. 21, 2022). Menzies's lawyers investigated whether he could claim reliance on advisors as a legal defense. D.I. 332-1, at 201. And as Menzies now argues, his "advisors" included Christiana. Pl.'s Resp. Br. 7 ("[H]e … relied on Christiana and his other advisors in proceeding with the investment."). Though his lawyers researched whether Menzies could rely on Christiana, they did not investigate Christiana at that time. And Delaware law imputes the knowledge of Menzies's lawyers to him. *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005).

Menzies says these facts suggest that the tax shelter lacked a legitimate legal basis, not any wrongdoing by Christiana. But Christiana was the trustee in the tax-avoidance strategy. D.I. 335-2, at 156–66. And it carried out the substitutions of assets between the trusts at Menzies's direction. D.I. 332-2, at 40–49. That substitution of assets was the "key to the transaction" designed to avoid taxes legally. 2d Am. Compl. ¶ 80. Because Christiana was vital to the tax-avoidance scheme, red flags about the scheme meant red flags about Christiana. And once Menzies's "suspicions [were] triggered, [he was] expected to act with alacrity to explore those suspicions as well as other possible instances of non-compliance." *Gen-E*, 2022 WL 2063307, at *3 (internal quotation marks omitted). So Menzies should have investigated Christiana once red flags about the transaction emerged.

Through any reasonable investigation, Menzies's lawyers would have discovered the basis for his cause of action. To rely on Christiana, they should have asked questions to determine whether Christiana was acting in good faith—such as whether Christiana investigated the legality of the tax scheme. *See Davis*, 2014 WL 4955502, at *4–5 (finding that an investigation can require asking questions to be reasonable). If Christiana had lied or hidden information, that concealment would have continued to toll his breach-of-fiduciary-duty claim. *See Halpern v. Barran*, 313 A.2d 139, 143 (Del. Ch. 1973). But "[m]ere ignorance of the facts by a plaintiff, where there has been no such concealment, is no obstacle to [the] operation of the statute [of limitations]." *Id.*

Menzies resists this conclusion by arguing that his claim depended on information within Christiana's exclusive control. He says his claim stems from privileged information and a law firm's invoice sent solely to Christiana. Pl.'s Resp. Br. 11. But to be on inquiry notice, Menzies did not need to discover "all of the aspects of the alleged wrongful conduct." *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *7. Instead, he only needed to be able to seek out the truth and discover enough facts to support any of the theories underlying his breach-of-fiduciary-duty claim. *Wal-Mart Stores*, 860 A.2d at 319. As discussed above, he should have investigated and would have discovered such facts no later than March 2012.

Menzies waited more than a decade to sue after Christiana allegedly breached its fiduciary duty. Though the clock paused because his injury was inherently

12

unknowable, it resumed no later than March 2012. Because that date was more than three years before he sued, the statute of limitations bars his fiduciary-duty claim.

### D. Menzies's other arguments fail

Menzies makes several other arguments in support of his position that he was not on inquiry notice. But they all fail.

*First*, he says "equitable tolling" applies because he relied on the competence and good faith of a fiduciary. Even if it does, his claims are still time-barred because equitable tolling "concludes when inquiry notice of the wrong is received." Pl.'s Resp. Br. 9 n.3 (citing *Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287 A.3d 1160, 1212 (Del. Ch. 2022)).

*Second*, Menzies says I should deny summary judgment because Christiana addressed only one of his claims. But he is wrong. As discussed above, his theories are simply different ways of proving the same claim. *See supra* pp. 4–5.

*Third*, Menzies says *Isaacson, Stopler & Co. v. Artisans' Savings Bank*, 330 A.2d 130 (Del. 1974), supports his position that he was on inquiry notice only after the IRS sent its official findings in September 2012. Pl.'s Resp. Br. 11–12. But *Isaacson* does not establish such a bright-line rule. Instead, it notes that "[a]pplication of the time of discovery rule is limited, and each case must stand or fall on its own facts[.]" 330 A.2d at 133. So *Isaacson* reinforces that inquiry notice depends on case-specific facts. The undisputed facts here show that there were clear red flags about the transaction, and, in turn, Christiana's role in that transaction, no later than March 2012.

\* \* \* \* \*

Not all deadlines are hard and fast. But under Delaware law, equitably extending the time to sue only lasts until a plaintiff is on inquiry notice of his claim. And for Menzies's fiduciary-duty claim, no reasonable juror could find that he was not on inquiry notice by the end of March 2012. Because that was still more than three years before Menzies sued Christiana, the statutory deadline bars his claim. So I grant Christiana Bank's motion for summary judgment.